**NICHOLSON FILE COMPANY**

v.

**H. K. PORTER COMPANY, Inc., et al.**

**Civ. A. No. 4876.**

United States District Court,
D. Rhode Island.
April 13, 1972.

Matthew W. Goring, George M. Vetter, Jr., Stephen J. Carlotti, of Hinckley, Allen, Salisbury & Parsons, Providence, R. I., for plaintiff.

Carl F. Barger, C. Arthur Wilson, Jr., of Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., and Peter L. Kennedy and Edward L. Maggiacomo, of Adler, Pollock & Sheehan, Providence, R. I., for defendants.

## OPINION

PETTINE, Chief Judge.

The plaintiff seeks preliminary injunctive relief praying that the defendants and each of them be enjoined from acquiring or attempting to acquire any shares of the plaintiff's stock; soliciting from any of its stockholders any proxy and from voting any stock now held, acquired or tendered, citing as reasons therefore violations of Section 13(d) (1) and Rule 10b–5 (adopted pursuant to Section 10) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(d) and 78j.

An evidentiary hearing was held commencing on April 10, and concluding on April 12, 1972.

Jurisdiction is founded on Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa.

## FINDINGS OF FACT

Anticipating an immediate appeal from this court's holding and a request by the unsuccessful litigants for an emergency hearing by the appellate court I will recite the findings of fact in somewhat of a detailed fashion.

The plaintiff, ("Nicholson") a duly incorporated Rhode Island company with its principal place of business within the jurisdiction of this Court has issued an outstanding 584,108 shares of one dollar par value stock and is engaged in the manufacture of files, saws and allied implements.

The defendant, H. K. Porter Company, Inc. ("Porter") a Delaware corporation is a conglomerate which prior to 1972 was engaged in the saw business through its Disston Division, so-called, and as of the date of this action, holds 32,406 shares of the plaintiff's stock. The other defendants are not entirely strange to "Porter" since Thomas M. Evans is chairman of its Board of Directors as well as President of Evans & Company, Inc., a New York stockbrokerage house which is the owner of 2,000 shares of the plaintiff's stock; while the defendant Reb & Co., a partnership, which owns 11,400 shares of the plaintiff's stock has Mr. J. S. Morrow, President of "Porter", as one of its partners.

Mr. Evans owns 51% or more of the "Porter" stock which company is also the beneficial owner of the 11,400 Reb & Co. shares while Mr. Evans personally is the beneficial owner of the Evans & Company, Inc. 2,000 shares.

On March 3, 1970 Mr. Evans caused to be incorporated in the State of Delaware a company called Industrial Saw Company which name on December 29, 1971 was changed to Disston, Inc. and on or about January 1, 1972 transferred to Disston, Inc. all of the assets in the Disston Division of "Porter" in return for its common stock.

On *February 2, 1972* "Porter" filed with the Securities and Exchange Commission a registration statement (amended February 22, 1972) stating that the offering of Disston, Inc. stock was to afford "Porter" an opportunity to " . . utilize the proceeds of the offering in a variety of ways including . . . the possible future acquisition of other businesses by Porter."

On *February 25, 1972* "Porter" held a Board of Directors meeting and as it might pertain to this case I find it was voted that on the assumption the sale and public offering of the Disston, Inc. stock was successful certain proposals with respect to the reduction of the Company's debt and the development of plans for improvement in existing facilities be implemented and that the proposal " . . . for making a tender offer for outstanding stock of Nicholson File Company be tabled until the various obstacles to such action were resolved, and that if and when these obstacles were removed, a special meeting of the Directors could be called, if necessary, for the purpose of further considering this matter."

**512**

The sale and public offering of all the Disston, Inc. stock was accomplished on *March 2, 1972* and on *March 3, 1972* "Porter" held a special meeting of its Board of Directors at which it was voted to "execute, deliver and promulgate" to the common shareholders of Nicholson File Company a "Request For Tenders for all or any part of the outstanding shares *of Common Stock of the said Nich-*olson File Company . . . " Pursuant to this Board's resolution a statement of information, Schedule 13D, was filed by "Porter" with the SEC on *March 6, 1972* and copies delivered to Nicholson on *March 6, 1972,* the day on which the "Tender Offer," (expiring April 4, 1972) was mailed to "Nicholson" stockholders. This "Tender Offer" advised that stock deposited in the mail prior to 4:00 p. m. Eastern Standard Time as of April 4, 1972 would be deemed to have been received by the Depository as of said date.

From this point on there was a veritable flood of correspondence to the stockholders and in an attempt to channel this deluge in some meaningful way I will list these seriatim by dates:

At this point I add, however, that this court entered a temporary restraining order against "Porter" on *March 30, 1972* effective as of 10:00 a. m. March 31, 1972 and scheduled a hearing for April 10, 1972; the expiration date of the tender offer was extended to noon *April 14, 1972* by letter of April 4, 1972 from "Porter" to the stockholders.

*Letters from "Nicholson" to the stockholders*

*March 22, 1972*—advised stockholders "Nicholson" had been contacted by a number of substantial corporations desirous of discussing mergers; that it "stands to reason that if Porter is willing to pay $42 per share for your stock it must see a value higher than its offer . . . . "; that the price offered was substantially less than book value—that it was less than the market high as "recently as 1968." "We strongly suggest that you not act

hastily. The offer is on a pro rata basis and not on a first come first-served basis. Therefor, there is absolutely no benefit to you in tendering your shares now . . . Your directors have considered the Porter offer very carefully and have unanimously concluded that there is no reason for them to be hasty in turning in their stock. The same applies to all stockholders."

Other portions of the letter strongly discourage acceptance of the "Porter" offer.

*March 28, 1972*—Advised the stockholders that "Walco National Corporation yesterday proposed a merger between Walco and Nicholson on the basis of 1⅔ shares of Walco common stock for each share of Nicholson common stock"; that the "Nicholson" Board had met and endorsed the preliminary merger as a better alternative than the "Porter" tender offer and that, "The Board is therefore recommending that Nicholson stockholders *not* turn in their shares to Porter."; the letter then went on to recite the benefits of Walco over Porter.

*March 29, 1972*—Announced the signing of a merger agreement between Walco and "Nicholson."; that "Your Directors have endorsed the Walco merger as a better alternative to the Porter tender offer and have stated that *none of them intends to tender a single share to Porter.*"; that no member of the Nicholson family and their relatives intended to tender any of their 86,000 shares and, "We hope you will follow our lead."; that Nicholson had filed a suit in the Federal District Court believing and alleging that "Porter" had committed serious violations of the federal securities laws in connection with its tender offer; other portions of the letter strongly recommend against acceptance of the Porter offer.

*March 31, 1972*—This correspondence was headed "Porter Tender Offer Blocked.";—it recites that this court had entered a restraining offer and emphasized it prohibited "Porter"

from purchasing shares and that "The order was granted based on Nicholson's complaint, previously filed with the Court, that Porter, Evans and the other members of the Porter group embarked on a scheme to obtain control of Nicholson in violation of the federal securities laws. . . . We strongly repeat our earlier recommendation to you : That you *not turn in* your shares to Porter, but that you retain them so that you may reach an intelligent and informed decision as to your alternatives. Remember once you turn in your shares to Porter you may not withdraw them without Porter's consent."

*April 3, 1972*—Announcing the receipt of a merger proposal from VLN Corporation and in part what it offered; that Walco was in the process of making a revised offer; that VLN in 1971 had sales of $100 million dollars.

*April 3, 1972*—Concerned the VLN merger proposals and that "Porter's latest letter to Nicholson stockholders, mailed after Nicholson brought its law suit, *permits any stockholder who turned his stock in* to Porter between March 25 and April 3 to *immediately withdraw his stock.*"; With the new merger proposals Mr. Williams (President of "Nicholson") expected Porter to be flooded with demands to return tendered shares.

*April 5, 1972*—stated that stockholders representing 14,000 shares advised they were demanding the return of their stock from Porter and in addition stockholders of 11,000 shares indicated they were considering the same action; and "We encourage every stockholder who has tendered his stock to Porter to demand its immediate return. Our Board thinks the VLN proposal is very attractive and has unanimously endorsed it"; that on the basis of a conversation ratio " . . . *each share of VLN preferred stock would have an indicated value of $53.10.* On the other hand, H. K. Porter, which extended its tender offer

to April 14, is still offering only $42 a share."

*April 4, 1972*—Advising that the First Circuit Court of Appeals in Boston declined to rule on the H. K. Porter Company motion to stay the temporary restraining order.

*Letters from "Porter" to the shareholders*

*March 24, 1972*—states in part:

"Regarding our cash offer of $42 per share for Nicholson Stock, Mr. George C. Williams, President of Nicholson (owning 285 shares of stock), wrote you advising against 'hasty action'. Mr. Williams also suggested that you delay tendering your shares until after you have received a further 'communication' from Nicholson *which will be mailed on Thursday, March 30, 1972*. What he neglected to point out was that, because of the present state of the mails and the fact that this weekend is the Easter holiday weekend, delaying acceptance of our offer in the manner he suggested *might well result in your missing the expiration date of April 4, 1972.*"

"Mr. Williams' letter also discussed the possibility of a merger with 'a number of substantial corporations'. To our knowledge, during the last few years several companies have approached Nicholson with a view to possible acquisition or merger, and these overtures have been uniformly rejected by Nicholson's management. That Nicholson is now suddenly considering such action raises a serious question as to whether its management is really thinking of your best interests as a stockholder."

\* \* \* \* \* \*

"The simple fact is that the price which we have offered you is almost *$10 a share above the highest bid* for Nicholson shares recorded by the National Quotation Bureau during the last two years."

"Delaying mailing your stock to the State Street Bank and Trust Company

until March 30 may well result in its arriving after April 4. Also, if you forward your stock, be sure that the certificate is properly signed and your signature guaranteed by a bank or trust company."

*March 30, 1972*—advising stockholders that—

"In order to avoid any confusion which may have resulted from our letter of March 24, 1972, relating to the request for tenders by Porter for Nicholson Common Stock, this is to advise that any stockholder who may have made his tender, by mail or otherwise, between March 25, 1972 and April 3, 1972, may withdraw his stock provided he gives written notice thereof, by letter or telegram, to State Street Bank and Trust Company, 225 Franklin Street, Boston, Massachusetts 02107, prior to 3:00 P.M., E.S.T., April 10, 1972. Such notice must be physically received by the Depository prior to such time in order to be effective."

"In addition to the 43,806 shares of Common Stock of Nicholson presently owned by Porter, the Depository has received, through March 30, 1972, tenders of an aggregate of 59,308 shares pursuant to the request for tenders."

This last correspondence was prompted by the SEC because at the time of the original tender offer, the defendant Porter, through instructions on the reverse side of the transmittal form, advised that stock deposited in the mail prior to 4:00 P.M. E.S.T. as of April 4, 1972 would be deemed to have been received by the Depository as of said date; yet by letter to stockholders dated March 24, 1972 signed by defendant Evans on "Porter" letterhead, the defendant "Porter" represented that to delay mailing acceptance of the tender offer might result in a shareholders' missing the expiration date by having it arrive after April 4, 1972.

*April 4, 1972*—this correspondence stated:

"H. K. Porter Company, Inc. is pleased to announce that it will extend until 12:00 Noon, E.S.T., on Friday, April 14, 1972, its Request for Tenders for 437,000 shares of Common Stock of Nicholson File Company at a net price of $42 per share in cash. Payment for shares previously tendered will be deferred until the extended expiration date. All shares tendered under the Request for Tenders as extended must be physically received by the Depository, State Street Bank and Trust Company, P.O. Box 5003, Boston, Massachusetts 02107, prior to 12:00 Noon E.S.T., on April 14, 1972. It is emphasized that the shares tendered must be physically received by the Depository prior to the extended expiration date, notwithstanding any instruction to the contrary in Paragraph A of the Letter of Transmittal."

"Except for the foregoing, all terms of Porter's Request for Tenders are to remain unchanged."

"In addition to the 43,806 shares of Common Stock of Nicholson presently owned by Porter, the Depository has received up to the present time, tenders of approximately 160,000 shares pursuant to its Request for Tenders."

*April 5, 1972*—this letter advised stockholders that "Porter" had received over 162,000 shares; that the First Circuit Court hearing modified this court's temporary restraining order to permit free communication by Porter—as "freely as Nicholson can do."; that "Even though Porter has the option of purchasing less than the 437,000 shares for which tenders have been requested, from the irresponsible way that the Nicholson directors have reacted to our request for tenders, we presently feel we can not safely acquire less than 250,000 shares which, together with our 43,806 shares, would constitute a majority of the outstanding shares of Nicholson."

"We feel that the decision of whether to accept or reject our cash offer is a matter for each individual stockholder to decide and is not a decision to be made by the directors of Nicholson."

The plaintiff's position in the present controversy is posited on a series of events commencing in 1969. Plaintiff's testimony developed that on or about January 23, 1969, Mr. Evans and a Mr. Puth, Vice President and Manager of "Porter's" Disston Division, met with Mr. Paul Nicholson, chairman of the "Nicholson" Board of Directors, to discuss a possible merger of "Porter" and "Nicholson." Evans was advised that such a transaction would be in violation of Section 7 of the Clayton Act because of the competing business of the Disston Division. As a result of further inquiry by Evans a letter was sent to him on February 10, 1969 stating the question of merger or consolidation was discussed with counsel whose unqualified opinion was that such action would precipitate a government attack as an antitrust violation. The date sequences are not entirely clear but it does appear that Mr. Williams, President of Nicholson met Mr. Puth in 1969 at a convention at which time Puth, presumably acting on behalf of "Porter" indicated they had acquired another large block of "Nicholson" stock and were still definitely interested in acquiring or merging with Nicholson and that the antitrust problems could be worked out. It also appears that on March 20, 1969 Mr. Puth visited "Nicholson" and stated "Porter" recognized the antitrust problem and felt "Porter" had two alternatives—either dispose of their "Nicholson" stock by selling it to another company or to "Nicholson" and asked if they were interested in purchasing at $50 a share. As a result of this meeting the "Nicholson" Board met and voted to refuse the offer to purchase. Later in 1969 Evans inquired of Mr. Nicholson if there had been a change of mind as to possible merger and was advised there had not been. Finally, around December 9–10 Mr. Puth came to "Nicholson" and advised "Porter" held close to 10% of "Nicholson" stock and that they were still anxious to merge. "Nicholson" reiterated its position.

On March 6, 1972 Mr. Morrow called on "Nicholson" and made a demand for their stockholders list as required by R. I. statute. At the same time he delivered a copy of form 13D and advised that as of 10 A. M. that morning they had filed with the SEC in Washington the 13D form.

Mr. Evans testified that defendant Reb & Co. is a nominee used by "Porter." It is a partnership with Mr. Morrow and others all employed by "Porter"; Evans & Co. is an investment member firm of "Porter" controlled by Mr. Evans. Neither Reb & Co. nor Evans & Co. as such have any beneficial ownership in the stock of "Nicholson."

He further stated that during the contracts or talks with "Nicholson" they never discussed specific terms of a possible business combination nor did he ever formulate any definite plan.

The original purpose of incorporating Industrial Saw wasn't entirely clear to him though he believed it may have been for some tax purpose. It remained as a nominal company owned by "Porter" and when they decided to sell Disston stock to the public they needed a corporation and so used it.

Prior to the public sale of Disston, Inc. shares "Porter" had not made any decision, whatsoever, with regard to plans to effect a business combination with "Nicholson". They decided to sell Disston because Mr. Puth who was in charge of the Disston Division had made an outstanding record by going into battery operated cutting tools. The earnings of Disston had greatly increased. Other companies in this field sold at "very high multiples" and it was pointed out to Evans that the price which might be realized on a sale of Disston could be more than the selling price of the entire H. K. Porter stock. Consequently, Puth was instructed to find an underwriter— from this point on the whole thing developed. Clearance had to be obtained from the SEC, an agreement executed with an underwriter, and figures developed. The underwriting agreement had

certain conditions which could result in its cancellation so he did not feel certain until stock was actually sold and the cash received. Further in connection with the clearance of the registration statement with SEC "Porter" did not think anyone knew when it would be in a position to receive an "effectiveness" to such statement and thus be in a position to go forward with its public underwriting. Excepting perhaps the underwriter; it wasn't until a week before the offering the underwriting agreement was signed. When the sale was finally realized they discussed at a Board meeting of "Porter" several possibilities for the use of the money such as bond investments, purchase of a steel tubing com-

pany that might fit well with their steel division, reduction of some short and long term debts, and offering $40 a share for "Nicholson". It was not decided until March 3rd as to exactly what they would do. They did conclude there was no possibility of merger with "Nicholson" as it had so indicated and therefore it meant a cash approach toward purchase of stock which could not be done until such money was realized.

## CONCLUSIONS OF LAW

### Section 13(d).[1]

■ Defendants dispute that § 13(d) (1) is applicable to them at all, as hold-

---

1. § 13(d), 15 U.S.C. § 78m(d) provides, in relevant part:

"(d) (1) Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to section 78*l* of this title, or any equity security of an insurance company which would have been required to be so registered except for the exemption contained in section 78*l*(g) (2) (G) of this title, or any equity security issued by a closed-end investment company registered under the Investment Company Act of 1940, is directly or indirectly the beneficial owner of more than 5 per centum of such class shall, within ten days after such acquisition, send to the issuer of the security at its principal executive office, by registered or certified mail, send to each exchange where the security is traded, and file with the Commission, a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors—

(A) the background and identity of all persons by whom or on whose behalf the purchases have been or are to be effected;

(B) the source and amount of the funds or other consideration used or to be used in making the purchases, and if any part of the purchase price or proposed purchase price is represented or is to be represented by funds or other consideration borrowed or otherwise obtained for the purpose of ac-

quiring, holding, or trading such security, a description of the transaction and the names of the parties thereto, except that where a source of funds is a loan made in the ordinary course of business by a bank, as defined in section 78c(a) (6) of this title, if the person filing such statement so requests, the name of the bank shall not be made available to the public;

(C) if the purpose of the purchases or prospective purchases is to acquire control of the business of the issuer of the securities, any plans or proposals which such persons may have to liquidate such issuer, to sell its assets to or merge it with any other persons, or to make any other major change in its business or corporate structure;

(D) the number of shares of such security which are beneficially owned, and the number of shares concerning which there is a right to acquire, directly or indirectly, by (i) such person, and (ii) by each associate of such person, giving the name and address of each such associate; and

(E) information as to any contracts, arrangements, or understandings with any person with respect to any securities of the issuer, including but not limited to transfer of any of the securities, joint ventures, loan or option arrangements, puts or calls, guaranties of loans, guaranties against loss or guaranties of profits, division of losses or profits, or the giving or withholding of proxies, naming the persons with whom such contracts, arrangements, or understandings have

ers of more than 5% but less than 10% of the shares of Nicholson on and since December 22, 1970. They argue that the December 22, 1970 amendment of Section 13(d) (1) reducing the ownership limitation from 10% to 5% does not operate retroactively. This contention is correct. See GAF Corporation v. Milstein, 453 F.2d 709, 718 n. 17 (2d Cir. 1971). No obligation fell on defendants to file a Schedule 13D merely by the change in the ownership requirements of Section 13(d).

Defendants further contend that § 13 (d) (1) does not apply here because there have been no shifts in control of Nicholson stock held by defendant group since before December 22, 1970. They argue that § 13(d) (1) was intended to provide notice to investors of shifts in corporate control. It is agreed that on and since December 22, 1970, Porter has been record owner of 32,406 shares of common stock of Nicholson, that Reb & Co. has been record owner of 11,400 such shares, and that Evans & Co. has been record owner of 2,000 such shares. Porter has since December 22, 1970 had beneficial ownership of all these shares but those held by Evans & Co., which are and have been since December 22, 1970 beneficially owned by Thomas M. Evans. There is uncontradicted evidence, and I so find, that Thomas Evans has a controlling interest in Porter and that Reb & Co. is Porter's nominee. Thus, defendants argue, beneficial control has at all times on and since December 22, 1970 been in one individual, Thomas Evans, and since that time neither Evans nor the Porter group have acquired additional interests in Nicholson stock. There is no evidence to dispute this. Defendants' position then is that beneficial control has consistently been vested in one individual and that there has been neither a shift in control

nor a pooling of interests of a group, as in the GAF and Bath [Bath Industries, Inc. v. Blot, 7 Cir., 427 F.2d 97] cases, to trigger the application of § 13(d) (1).

Plaintiff vigorously contends that several juridical personalities are involved and that there has been a pooling of interests in the form of a common intent to acquire control of Nicholson, although they concede Thomas Evans to be the controlling force. Going further, plaintiff contends that even if only one individual is involved, the intent of that individual, a 5% beneficial owner since December 22, 1970, to acquire control of Nicholson triggers application of § 13(d) without further acquisition of interest in Nicholson stock.

■■ Thus are raised the questions of Congressional intent in the Williams Act and of the interrelationship of § 13(d) and § 14(d). Examination of legislative history and commentary indicates the weakness of plaintiff's position. A summary of the Williams Act in its legislative history, see House Rep.No. 1711, 1968 U.S.Code Cong. & Admin. News pp. 2811, 2817–2819, makes it evident that while § 14(d) is concerned with tender offers, § 13(d) is concerned with acquisition *by any method* of more than 10% (now 5%) of a class of registered securities. Also, the history states

"The purpose of section 13(d) is to require disclosure of information by persons who have acquired a substantial interest, or increased their interest in the equity securities of a company by a substantial amount, within a relatively short period of time."

The fact that § 13(d) calls for disclosure after acquisition, whether acquisition is by an individual or by the pooling of interests of a group, indicates an intention not to give information by way of disclosure useful to block acquisition,

---

been entered into, and giving the details thereof.

. . . . .

(3) When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person' for the purposes of this subsection."

but rather an intention to divulge information of the potential effects such acquisition will have in the investment. Section 14(d) operates to provide the shareholder information *before* acquisition by tender offer takes place. As has been noted:

"Unless management is considered the sole beneficiary of this disclosure, a proposition vehemently denied after S. 510 was introduced, those receiving the information have no effective means at their disposal to prevent the assertion of control. Rather, they are being supplied with information necessary to adjust for that possibility in their valuation of the corporation for investment purposes."

Comment, Section 13(d) and Disclosure of Corporate Equity Ownership, 119 U.Pa.L.Rev. 853, 865–66 (1971).

As was recognized by the Court in the *GAF* case, an actual intent on the part of a group to acquire shares in or acquire control is irrelevant to § 13(d). Section 13(d) is triggered by the formation of the group in common purpose, not by the intent of the group to acquire control. Plaintiff's argument as to intent is misplaced.

A crucial point is that § 13(d) applies to "persons who have acquired a substantial interest, or increased their interest . . . by a substantial amount, *within a relatively short period of time.*" The Act contains an exemption for small acquisitions over a period of time (2% over 12 months), and by its terms does not apply to already existing shareholders. Turning again to commentary, I find it said:

" . . . the aim of section 13(d) is disclosure of new aggregations which present the possibility of a change. The logic of the Act assumes that longstanding accumulations will have already effected their influence, and that slowly acquired blocks do not represent a control threat. All new, rapidly acquired accumulations are within the disclosure requirements be-

cause the ability to influence control has been achieved, and only recently." Comment, *supra,* at 866.

■ This view was adopted in *GAF Corporation, supra,* 453 F.2d at 718:

"The history and language of section 13(d) make it clear that the statute was primarily concerned with disclosure of potential changes in control resulting from *new aggregations* of stockholdings." (Emphasis added.)

Whether there was a group or an individual which controlled the Nicholson stock, and I find it to be controlled by Thomas Evans on and since December 22, 1970, the accumulation of stock has remained constant since December 22, 1970. I note that even if a group is involved it hardly seems a group which was formed to "acquire, hold, or dispose" of Nicholson's stock, as required by section 13(d) (3).

For these reasons I find, at this point of the case, no reason to conclude that defendants were under any obligation under § 13(d) and that plaintiff's motion for injunctive relief on this ground must fail.

■■ Even if § 13(d) (1) did impose a duty on defendants here, plaintiff has failed to meet its burden on preliminary injunction. While issuance of a preliminary injunction is ordinarily a matter in the discretion of the Court, plaintiff has the burden of showing probability of success on the merits, irreparable injury, and that the balance of the equities and public interest weigh in favor of issuance of the injunction. Embassy Dairy v. Camalier, 93 U.S.App.D. C. 364, 211 F.2d 41 (1954); Communist Party v. McGrath, 96 F.Supp. 47, 48 (D. C.D.C.1951). Plaintiff's case is lacking in each of these elements.

Assuming arguendo that § 13(d) (1) was applicable to defendants, I find that plaintiff's argument that there was an intent and an agreement to acquire control of Nicholson sometime prior to January 1, 1972 and that the ten day period of § 13(d) (1) for filing of a

Schedule D ran from that time to be overmuch. Appreciative of the difficulties of the little time for discovery prior to plaintiff's motion for preliminary injunction, there is strong circumstantial evidence of, and I find an intent on the part of Porter to acquire Nicholson as far back as 1969. However, this intention was not unqualified, as Porter also offered to sell its share of Nicholson stock to plaintiff and to others as late as the summer of 1971. And if there was an "agreement" to acquire Nicholson, it was necessarily dependent on the meeting of several prior substantial conditions. Having been advised by Nicholson in 1969 that Porter through its Disston Division would be in violation of antitrust laws if it acquired Nicholson, Porter was in no position to "agree" to acquire Nicholson until it could reasonably forecast the success of divestiture of Disston both for antitrust and financial reasons. This depended in turn on successful incorporation of Disston, successful registration of Disston shares with the Securities Exchange Commission, and successful execution of an underwriting contract. There is uncontradicted evidence that at the February 25, 1972 meeting, the Board of Directors of Porter considered alternative uses of the proceeds of the Disston stock sale. It was finally concluded on March 3, 1972 that Porter would use the proceeds to make a tender offer to Nicholson shareholders. Porter filed a Schedule 13D within ten days of the February 25, 1972 Board meeting.

 It would strain my sense of fairness and of reason to assume that Congress intended a Schedule 13D to be filed on each of the many plans for growth a 5% shareholder may have before there is any choice among the plans which could be reasonably made. Plaintiff argues that defendants should have filed a Schedule 13D pursuant to § 13(d) before or shortly after January 1, 1972, the date Porter began the divestiture process. Any statement by Porter at that time would have been premature, and, of necessity, vague and indefinite. Without opining on the accuracy of defendants' claim that such a statement might well have violated Section 10(b) of the Securities Exchange Act and Rule 10-B-5, I would note that such disclosure could only encourage speculation. As was noted in the context of adequacy of a Schedule 13D in Susquehanna Corporation v. Pan American Sulphur Co., 423 F.2d 1075, 1085 (5th Cir. 1970):

> "The person or corporation filing a Schedule 13D statement . . . must . . . be precise and forthright in making full and fair disclosure as to all material facts called for by the various items of the schedule. At the same time he must be careful not to delineate extravagantly or to enlarge beyond reasonable bounds. *The securities market is delicately arranged and needs only slight impetus to upset it.*" (emphasis added.)

And, as the Court said in Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 948 (2d Cir. 1969):

> "It would be as serious an infringement of these [SEC] regulations to overstate the definiteness of the plans as to understate them."

It seems unreasonable to require disclosure statements whose adequacy is so open to attack for overstatement as well as understatement because the party's plans or designs are necessarily contingent and indefinite. See *Susquehanna, supra,* 423 F.2d at 1085. It might well have happened that the attempt to divest Disston would have been unsuccessful and Porter would never have made a tender offer to Nicholson.

 Plaintiff has not, then, met the standard for probability of success. Moreover, I cannot give credence to claims of irreparable injury to the Nicholson shareholders from the fact that a Schedule 13D statement was not filed around January 1, 1972. Had a Schedule 13D statement been filed then it would not have, presumably, contained details of tender offer, source of funds for acquisition, or definite post-acquisition plans, but rather would have contained a conditional intention to acquire control

of Nicholson. Thus Nicholson's contention now that the damage suffered was a loss of at least two months in which Nicholson management could evaluate the tender offer and provide information to its shareholders seems a bit whimsical. On the contrary, should injunctive relief issue the shareholders of Nicholson would be deprived of the opportunity to sell to Porter at the tender offer price. The choice should, in equity, be preserved to the shareholders. See Ozark Air Lines, Inc. v. Cox, 326 F.Supp. 1113, 1119 (D. Mo., 1971). As the Second Circuit has stated,

> "While courts should rigorously enforce the policy of honesty and fair dealing prescribed by federal securities legislation, they must guard against the risk that, at the instance of incumbent management, they may be frustrating

informed shareholders from doing what the latter want."

Butler Aviation International v. Comprehensive Designers, Inc., 425 F.2d 842, 845 (2d Cir. 1970).

The intent of § 13(d) was to protect shareholders, not to give management a tool to fight off unwelcome tender offers. The firmness with which Nicholson management in a number of letters urged its shareholders to reject Porter's offer beggars its contention that it needed more time to evaluate the offer. It managed very quick evaluations of the relative merits of the VLN, Walco, and Porter offers.

*Sections 14(d) [2] and (e) [3] (15 U.S.C. § 78n(d) and (e)).*

Section 14(e) prohibits the making of any untrue statement of material fact or

---

2. § 14(d), 15 U.S.C. § 78n(d), provides in relevant part:

"(d) (1) It shall be unlawful for any person, directly or indirectly, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, to make a tender offer for, or a request or invitation for tenders of, any class of any equity security which is registered pursuant to section 78*l* of this title, or any equity security of an insurance company which would have been required to be so registered except for the exemption contained in section 78*l*(g) (2) (G) of this title, or any equity security issued by a closed-end investment company registered under the Investment Company Act of 1940, if, after consummation thereof, such person would, directly or indirectly, be the beneficial owner of more than 5 per centum of such class, unless at the time copies of the offer or request or invitation are first published or sent or given to security holders such person has filed with the Commission a statement containing such of the information specified in section 78m(d) of this title, and such additional information as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors. All requests or invitations for tenders or advertisements making a tender offer or requesting or inviting tenders of such a security shall be filed as a part of such statement and shall contain such of the

information contained in such statement as the Commission may by rules and regulations prescribe. Copies of any additional material soliciting or requesting such tender offers subsequent to the initial solicitation or request shall contain such information as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors, and shall be filed with the Commission not later than the time copies of such material are first published or sent or given to security holders. Copies of all statements, in the form in which such material is furnished to security holders and the Commission, shall be sent to the issuer not later than the date such material is first published or sent or given to any security holders.

. . . . .

(3) In determining, for purposes of this subsection, any percentage of a class of any security, such class shall be deemed to consist of the amount of the outstanding securities of such class, exclusive of any securities of such class held by or for the account of the issuer or a subsidiary of the issuer."

3. § 14(e), 15 U.S.C. § 78n(e) provides:

"(e) It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in

omission to state a material fact which renders a tender offer misleading. Plaintiff maintains that, although the tender offer itself stated that shares would be deemed to have been received on time if postmarked prior to 4:00 p. m., April 4, 1972, a letter from defendant Thomas Evans to Nicholson stockholders urged shareholders to mail early so as not to miss the expiration date.

I accept plaintiff's test for the materiality of a misrepresentation, that is, whether there is a substantial likelihood that the misstatement may have led a shareholder to tender his stock whereas in the absence of the misrepresentation he would have taken a contrary action. See General Time Corporation v. Talley Industries, Inc., 403 F. 2d 159, 162 (2d Cir. 1968). However, I find that defendants' curative letter of March 30, 1972 and the opportunity of tenderers influenced by the misstatement to rescind to have nullified any effect of this misrepresentation. While it may be true, as plaintiff suggests, that a failure to cure might have indicated that defendants did not consider the misstatement material, it does not follow, as plaintiff urges, that an attempt to cure is an admission of material misstatement. Such a holding would unwisely penalize parties who acted in good faith to rectify errors whether material or nonmaterial. Nor does this constitute violations of § 13(d) or of § 14(d). The Nicholson shareholders have suffered no damage as a result of this.

*Section 10 [4] and Rule 10b–5.*

Nicholson lacks standing to allege violations of Section 10(b) and Rule 10b–5. I can do no better than to quote from the GAF decision:

" . . . the implications of the enactment of section 14(e) making it illegal to make false or misleading statements 'in connection with any tender offer,' as distinguished from the 'purchase or sale of any security,' are somewhat clearer. We recognized in Iroquis Industries, Inc. v. Syracuse China Corporation, 417 F.2d 963, 969 (2d Cir. 1969), cert. denied, 399 U.S. 909, 90 S.Ct. 2199, 26 L.Ed.2d 561 (1970), '[t]hat Congress enacted the new Section . . . is at least an indication that in tender offer contests such as that at bar there was no standing to sue under Rule 10b–5 by either the tender offeror or by the target corporation.' The same reasoning is just as meaningful in the framework of section 13(d), and accordingly we are chary of finding that [plaintiff] based on the allegations before us, has standing under Rule 10b–5."

453 F.2d at 721–722.

See also Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952).

For the above reasons, plaintiff's motion for preliminary injunction is denied. The allegations of violation of § 10(b) and Rule 10b–5 contained in the complaint

---

any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative."

4. § 10(b), 15 U.S.C. § 78j(b) provides:
 "It shall be unlawful for any person, directly or indirectly, by the use of any

means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

 . . . . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

are dismissed. The temporary restraining order is hereby dissolved. Ruling on costs is reserved. Parenthetically, I must apologize for the possible lack of literary refinement and preciseness of citation in this opinion which I attribute to the less than 24 hours in which it had to be written and typed.