## In re ANDERSON, CLAYTON SHAREHOLDERS' LITIGATION.

BEAR, STEARNS & CO., INC., Gruss Petroleum Corp., and Gruss Partners, Plaintiffs,

v.

ANDERSON, CLAYTON & CO.; F.F. Avery; G. William Miller; Richard J.V. Johnson; S.M. McAshan, Jr., T.J. Barlow; W. Fenton Guinee, Jr.; John L. Fichter; Benjamin M. Baker, Jr.; Charles L. Blackburn; John T. Cater; Ralph L. Cobb; Jennings F. Futch; John B. Powell, Jr.; D.M. Buchanan; R.F. Harris; W.W. Vann, Defendants.

Court of Chancery of Delaware, New Castle County.

Submitted: June 9, 1986.
Decided: June 10, 1986.

---

See also 519 A.2d 680.

A. Gilchrist Sparks, III, Lawrence A. Hamermesh, and Edmond D. Johnson of Morris, Nichols, Arsht & Tunnell, Wilmington, and Dennis J. Block, and Joseph S. Allerhand of Weil, Gotshal & Manges, New York, Joseph A. Rosenthal and Kevin Gross of Morris & Rosenthal, Wilmington and Stuart D. Wechsler, Robert I. Harwood

and Zachary A. Starr of Goodkind, Wechsler, Labaton & Rudoff, New York, for plaintiffs.

Charles F. Richards, Jr., Samuel A. Nolen, Thomas A. Beck, Gregory P. Williams and Nathan B. Ploener of Richards, Layton & Finger, Wilmington and Stephen G. Tipps and Paula M. Desel of Baker & Botts, Houston, Tex., for defendants.

ALLEN, Chancellor.

The pending motions to enjoin a proposed recapitalization of Anderson, Clayton & Co. (the "Company") presently scheduled to be consummated today places in apparent opposition two important stockholder interests.

On plaintiffs' view of the case this Court must now act to protect an interest each shareholder of the Company has in maximizing the present value of his or her stockholdings. That important interest is threatened, on this view, by the imminent action of a self-interested board of directors to consummate the recapitalization and thereby preclude the Bear, Stearns/Gruss plaintiffs ("B/S/G") from offering to shareholders an alternative transaction which those plaintiffs contend is worth substantially more per share.

On defendants' view of the case, the stockholder interest importantly involved on this motion is an interest in stockholder sovereignty. That is, defendants contend that the shareholders—having overwhelmingly approved the recapitalization at their June 3, 1986 meeting called to vote on that proposal—have indicated their will and this Court has been shown no sufficient justification to insert any judgment of its own into the question what action is now appropriate in the best interests of the shareholders.

Accordingly, one is reminded at the outset that it frequently occurs in a legal analysis that to define the relevant issue is the first and frequently the most important step in the process of determining, if not justifying, the judgment reached. In this instance, both perspectives suggested share a common ground, however; both critically rest upon an assertion, implied or expressed, concerning the meaning or effect of the recent shareholder vote. In thus struggling to determine whether this Court's duty lies in acting decisively to try to protect the shareholders' interests in possibly liquidating their stockholdings at what may be a substantially higher value than that offered to them in the recapitalization or rather whether the Court's duty lies in according to the will of the shareholders preclusive deference, the critical issue relates to the circumstances surrounding that vote: were stockholders afforded the material information that they needed to make a knowledgeable choice and was that information presented in a manner, including in time, to permit informed choice and effective action by the board on that choice?

I.

The background of the present dispute, including a description of the proposed recapitalization, its evolution, the last-minute announcement by B/S/G of an alternative to the recapitalization that may be worth substantially more to shareholders, and a discussion of certain legal issues earlier treated, is contained in this Court's opinions of June 2, 1986 and June 6, 1986 in these cases. *See, In Re Anderson, Clayton Shareholders' Litigation*, Del.Ch., C.A. No. 8387, Allen, C. (June 2, 1986; June 6, 1986), supra. Time does not permit a review of the complex factual matters set forth in those opinions. The facts that have developed since the May 27th date of the argument of an earlier preliminary injunction application in this case, however, will necessarily have to be sketched at least in outline.

A. *Announcement of the B/S/G Proposal*

The best advice available to the board when it adopted the proposed recapitalization and recommended it to the shareholders was that each existing shareholder

would receive in exchange for each current share, cash and securities worth between $43 and $47. Of that amount $37 would be cash, and under the proposed recapitalization would be distributable on a capital gains tax basis. The remaining consideration would be a portion of a share of new Common Stock of the Company. The board established June 3, 1986 as the date of a special meeting of stockholders called for the purpose of voting upon the recapitalization and on April 22, 1986 distributed to shareholders of record proxy solicitation materials.

On May 29, 1986 B/S/G, after having some preliminary discussions with management of Anderson, Clayton on the prior day, delivered to the President of the Company a letter stating that Bear, Stears & Co. and Gruss & Company "hereby submit an offer to acquire Anderson, Clayton & Co. in a cash merger transaction in which all shareholders of the Company would receive $54 in cash for each share ... owned...." The letter went on to state that B/S/G was "highly confident of the availability of the funding necessary to consummate the [proposed transaction] in an expeditious manner."

The B/S/G letter disclosed that funding for that proposal would be derived in part from the consummation of an agreement that the letter stated had been reached in principle with the Quaker Oats Company for the purchase of Anderson, Clayton's Gaines Foods, Inc. subsidiary and in part from bank financing that had not yet been finally committed to. The letter provided as well that "[c]onsummation of the [proposal] would be subject to abandonment of the Recapitalization, approval of the Company's Board of Directors and shareholders, satisfaction of applicable regulatory requirements, execution of definitive funding agreements, and the execution of mutually acceptable definitive agreements with the Company and with The Quaker Oats Company."

This proposal received a not altogether warm response. Management of the Com-

pany immediately issued a short press release stating in part:

"In response to the Bear, Stearns & Co. announcement earlier today, Anderson, Clayton & Co. said that a prompt board of directors meeting would be held to consider the matter. In the meantime, the Company cautioned that the proposal was tentative and did not recognize the fundamental difference between the pending recapitalization transaction in which the Company shareholders have a continuing equity interest and a sale of the entire company."

The Company's board met later in the day on May 29. The board of directors of Anderson, Clayton is presently comprised of sixteen members, eight of whom are officers of the Company and thus have an interest not only in maintaining their positions in the face of a possible change in control of the Company, but also a prospective financial interest in an ESOP that the recapitalization would establish. The remaining eight directors are neither officers of the Company nor are they otherwise financially interested in the recapitalization except in their status as stockholders. In all events, at its May 29th meeting the board took several steps. After hearing reports from its outside counsel and from a representative of the First Boston Corporation, its financial adviser with respect to the recapitalization, the board resolved that it was advisable and appropriate to continue with the pending recapitalization on its present schedule. The board also resolved:

"that members of management ... are hereby authorized to meet with representatives of the Bear, Stearns/Gruss group and to seek to resolve the numerous uncertainties posed by the Bear, Stearns/Gruss letter proposal and in connection therewith to provide any information reasonably requested by the members of that group subject to appropriate confidentiality protection."

Working over the weekend to prepare a proxy supplement relating to the dramatic, last-minute surfacing of a possible alterna-

tive transaction, the Company distributed, by mailgram, on Monday morning June 2nd, a four page statement that included the full text of the B/S/G letter together with the Company's statement recommending the shareholders vote for the recapitalization. That supplement contained the following statement:

> While deciding to convene the stockholders' meeting as scheduled, the Board of Directors authorized management to meet with representatives of the Bear, Stearns/Gruss group and to seek to resolve the numerous uncertainties posed by the letter proposal. Representatives of the Company are continuing to discuss the Bear, Stearns/Gruss proposal with representatives of those firms. Prior to consummation of the proposed Recapitalization, the Board will consider any proposals then available to the Company; such consideration and decision may take place either before or after the stockholder vote on the Recapitalization.

In clearing the proxy supplement with the Securities and Exchange Commission, the Company negotiated to keep the polls open beyond the June 3rd meeting itself until 5 p.m. Eastern Daylight Savings Time on Thursday, June 5. In addition, the Company established a procedure by which shareholders could telephone, toll-free a given number in order to send a mailgram revoking prior proxies and voting on the recapitalization proposal afresh.

The proxy supplement which informed shareholders of these steps and contained the text of the B/S/G offer was published in the Monday morning national editions of the New York Times and the Wall Street Journal.

**B.** *The Failure to Accomplish Substantive Negotiations.*

There have been no substantive negotiations between the Company and B/S/G. Both sides attempt to blame the other for this failure. Plaintiffs claim that there is no interest on the part of the board of Anderson, Clayton to fully, fairly and effectively explore the option that their alternative transaction represents. In their view, all that has happened in the short period since May 29 reflects a foot-dragging recalcitrance on the part of the Company's management.

On the other hand, Anderson, Clayton claims that substantive negotiations have not proceeded because of B/S/G's unwillingness to agree to the necessary confidentiality and standstill undertakings that are conditions for its furnishing to B/S/G the information that it wants. The Company contends that the form of confidentiality and standstill agreement that it insists upon is one that is less burdensome than the form of agreement that it required from those companies to whom it has supplied confidential business information over the course of the last year while it probed for alternative forms of transactions to the recapitalization.

In any event, the only negotiations that have occurred between B/S/G and management and/or its representatives have been sporadic and have been limited to discussions as to the conditions under which information concerning the Company would be provided to B/S/G. Importantly, it now appears that the hang-up on this front really has nothing to do with confidentiality, but rather with the Company's insistence that B/S/G enter into a standstill agreement. Under that agreement B/S/G would not be permitted to "initiate, instigate or join in any litigation challenging [the Company's] pending recapitalization transaction or otherwise to interfere with the recapitalization transaction." Furthermore, for a period of two years from the date of the agreement, B/S/G would be barred from soliciting proxies and from advising or influencing any Company stockholders with respect to the voting of their shares.

The issue of the standstill agreement has not been resolved and the Company has refused to enter into any substantive discussions without such a commitment. Indeed, the amount of time devoted to attempting to resolve even this issue has

been very limited. B/S/G, on its side, has set no preconditions to entering into substantive talks.

It is impossible in the time frame provided and at this preliminary stage of litigation to attempt to determine which party's view of the cause of the failure for active negotiations to proceed is accurate or more nearly accurate.

### C. *The Vote.*

Approximately 12,200,000 shares were entitled to vote at the June 3 meeting. A tentative result from that vote indicate that 8,231,061 shares were voted in favor of the recapitalization and 1,973,498 shares against. The phone number provided to the shareholders to vote (concerning which I imply no view as to its legal effectiveness) was utilized by shareholders representing only 100,590 shares; of that number, 68,733 (68%) voted against the recapitalization, 22,090 (22%) voted in favor of the recapitalization and 9,767 (10%) utilized the unusual procedure to abstain from voting.

### D. *The June 7 Anderson, Clayton Board Meeting.*

Anderson, Clayton's board of directors met on June 7 to consider the status of the recapitalization proposal and the B/S/G "offer." Three of the Company's outside directors were unable to attend. At that meeting, which lasted approximately 2½ hours, the board received reports from its outside legal counsel, and from its investment banker. Notably, at the meeting First Boston—who had earlier given the informal advice that the securities to be received by the shareholders in the recapitalization might not unreasonably be expected to trade in a range of $6 to $10 per share (which informal view had been included in the April 22, 1986 proxy solicitation materials) now expressed a view, although not a firm opinion that "one could come up with a range of $13 to $18" for such security. This dramatic change in view was attributed to a number of factors

occurring since the February meeting where the earlier view had emerged. First Boston also reported its view that the B/S/G proposal remained tentative and conditional and stated that, even assuming that a firm $54 proposal had been made, that "First Boston could not say that such a proposal would be better for the Company or its shareholders than the recapitalization proposal." At some point in the June 7 meeting the inside directors excused themselves and the remaining 5 directors present conferred privately for 20 minutes with the Company's financial and legal advisers. Following these discussions, the independent directors voted and unanimously approved consummation of the recapitalization. Thereafter, the interested directors returned and upon motion the entire board adopted resolutions authorizing the consummation of the recapitalization and rejection of the proposal contained in the B/S/G letter delivered to the Company on May 29, 1986.

### II.

The test for the issuance of a writ of preliminary injunction is well settled and needs no repetition here. *See, Shields v. Shields,* Del.Ch., 498 A.2d 161 (1985).

As I view the current application, three issues are presented.

First, assuming that the proxy disclosures and supplemental disclosures were full and fair, have defendants met their continuing duty to explore in good faith alternatives to the recapitalization before electing to consummate that transaction?

Second, assuming that the proxy solicitation materials and supplements thereto fully and fairly disclose all material facts, do the circumstances surrounding that disclosure—meaning specifically the extraordinary lateness of a development of significance—nevertheless fatally flaw the effectiveness of such disclosure and vitiate the effect of the vote based upon it?

Third, is the proxy solicitation's disclosure concerning appraisal rights accurate

as a matter of law and if it is inaccurate, is that inaccuracy material to a shareholder's decision to approve or reject the proposed recapitalization?

These issues will be discussed in turn. The extraordinarily limited time available for decision of this motion precludes discussion of all of the appropriate precedents.

For the reasons that follow, I conclude that plaintiffs have demonstrated a reasonable probability of ultimate success on the claim that the circumstances surrounding the shareholder vote—including both certain elements of the disclosures contained in the June 2 Supplemental Proxy Solicitation and the timing of the vote in light of material developments—render that vote undependable as an expression of a knowing choice by the shareholders to approve the recapitalization in the circumstances present on June 3. Each element of the flaw in the process, as I see it, is discussed below.

■■■ In reaching this view of the probability of success, I place the burden upon plaintiffs to persuade me that the vote has a substantial risk of fundamental impairment. I have not, however, for two reasons, afforded to defendants the weighty presumption that the business judgment rule ordinarily accords to decisions of disinterested directors in running the corporate enterprise. First, and most importantly, the question whether shareholders have, under the circumstances, been provided with appropriate information upon which an informed choice on a matter of fundamental corporate importance may be made, is not a decision concerning the management of business and affairs of the enterprise (8 *Del.C.* § 141(a)) of the kind the business judgment rule is intended to protect; it is rather a matter relating to the directors' duty to shareholders who are technically outside of the corporation. The analogy—imperfect though it is—between a trustee and a *cestui que trust* has been drawn upon. In both situations the duty to the beneficiary is a thing apart from the

duty and authority to deal with the property subject to the trust.

Less technically, decisions dealing with the quality of, and the circumstances surrounding, disclosures are not inherently of the kind which courts are ill suited to treat on their merits. Thus, one of the underlying reasons for the great deference the business judgment rule carries with it, is not present in a setting of this kind. The quality of disclosure is inherently something that the court itself must ultimately evaluate. It would be surprising, for example, to find a case in which a plaintiff has demonstrated to a court's satisfaction that a truly important piece of information, within the knowledge of the board, had not been disclosed, but the court nevertheless denied an application for a preliminary injunction on the basis that while the Court found the information highly material, reasonable men could differ on the subject and the board's decision not to disclose, having been made in good faith, should be deferred to. I doubt that that is the law.

The second reason I have thought this an inappropriate occasion for the business judgment rule application is that it is clear at this point that the B/S/G alternative represents a threat to corporate control. The board of the Company is composed in large part of officers of the Company or its subsidiaries whose positions are threatened by that alternative. That, of course, does not mean that the board has not been properly motivated in its actions since the emergence of the B/S/G possible alternative transaction. It does, however, affect the degree of appropriate deference to be accorded to the board's decision to proceed with the vote in these circumstances.

Therefore, I have placed the burden upon plaintiffs on this motion, but in attempting to assess whether plaintiffs have shown a reasonable probability that they will ultimately show that the June 3 vote was defective, I have not considered that defendants need merely show good faith and reasonable care in order to preclude plaintiffs' showing.

Two other facts have sharply affected my judgment on this motion. Both relate to the balancing of harms. First, defendants complain that the motion should be denied because, among other reasons, money damages would be adequate. I consider that damages would be exceedingly difficult to demonstrate in these circumstances even if one assumes injury in fact.

More important in my own mind than the inadequacy of money damages is the fact that in weighing competing harms to plaintiffs' interests that may be precluded by the preliminary injunction against the injury to the Company that may be occasioned by it, I see the balancing favoring plaintiffs. Denial of the injunction will, I am persuaded, effectively preclude the possibility of the B/S/G alternatives. (Were I able to conclude that the shareholders had, in approving the recapitalization, rejected that alternative, the preclusive effect of such denial would be of no concern. For the reasons set forth below, however, I cannot now so conclude.) Granting of the injunction will preserve that possible opportunity and will not preclude the later implementation of the recapitalization. That alternative is under the control of the board and does not in any important way involve a third party transaction. I recognize that delay in any large transaction may involve risks of employee agitation or market fluctuations, but in these circumstances, I do not regard them as especially significant in light of the fundamental importance of the recapitalization and its likely long-term consequences.

Defendants will, of course, have the option of proceeding to final hearing in these cases and thus may preserve an opportunity to finally litigate the questions here treated preliminarily. Should they so elect, they will preserve as well the status quo with respect to the vote that has been taken. I will not order a further proxy solicitation at this time. That affirmative relief is inappropriate in my view in an application of this kind.

## III.

■ I start my analysis of the probability of success with the recognition that directors of a Delaware corporation have no duty to delay an otherwise appropriate transaction just because at the last minute a possible alternative arises that might, if it could be arranged, be more beneficial to the corporation or its shareholders then the transaction with which the company has been proceeding. *See GM Sub Corp. v. Liggett Group, Inc.*, Del.Ch., C.A. No. 6155, Brown, V.C. (April 25, 1980). *See also, Robinson v. Pittsburgh Oil Refining Corp.*, Del.Ch., 126 A. 46 (1924); *Smith v. Good Music Station, Inc.*, Del.Ch., 129 A.2d 242 (1957). But the board does have a duty, at least when the transaction is as significant as one that requires a shareholder vote, to explore and evaluate alternatives. *Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858 (1985).

It appears that the board of Anderson, Clayton did a probe for alternatives to the recapitalization prior to the February meeting at which it approved the recapitalization transaction. While I cannot say that the board has since May 28, when the B/S/G proposal first surfaced, explored that option, it has apparently nevertheless rejected it at its June 7 board meeting. It has perhaps done so on the view that even if the contingencies that it views as present in that proposal were removed, that it still represents a less desirable alternative than the recapitalization. Apparently First Boston provided at the June 7 board meeting some basis for such a conclusion.

The rejection of even a firm B/S/G offer on such a basis would, of course, be a rational choice. A reasonable director or a reasonable shareholder could, on strictly economic grounds, prefer the recapitalization to even a firm B/S/G offer at $54 per share. It is unclear what the stub-share that shareholders will receive in the recapitalization may be worth and one could well prefer to maintain the interest in the ongoing business of the Company that that stub-share represents, to the option of re-

ceiving now $17 more in cash. Thus, had the board in the proxy supplement said that even were the B/S/G proposal a firm offer, it would reject it because on its view the recapitalization presented better value to the shareholders, shareholder approval of the recapitalization, in those circumstances, would likely end this matter.

However the shareholders did not reject a firm B/S/G offer. They rejected—to the extent their vote can be reflected as a judgment on the B/S/G proposal—a proposal that it was emphasized was subject to contingencies. The shareholders were told:

> After examining all the contingencies specified in the letter proposal and considering the tentative nature of the proposed arrangements, the Board of Directors decided that it was advisable and appropriate to continue with the ongoing arrangements for the pending Recapitalization. In reaching this decision, the Board considered the advice of its financial advisor, The First Boston Corporation, which emphasized the tentative nature of the letter proposal.... First Boston pointed out that the proposal was contingent upon financing, reaching an agreement with Quaker Oats and receipts of regulatory approvals.... In light of these contingencies, ... the Board of Directors concluded that the proposal was tentative.

The shareholders were also told that the board would attempt to resolve the tentative nature of the proposal even if the shareholders approved the recapitalization:

> While deciding to convene the stockholders' meeting as scheduled, the Board of Directors authorized management to meet with representatives of the Bear, Stearns/Gruss group and to seek to resolve the numerous uncertainties posed by the letter proposal.

Indeed shareholders were told that discussions were continuing with B/S/G and the implication of the following statement is that substantive exploration of the alternative possibility was going forward and would be pursued:

> Representatives of the Company are continuing to discuss the Bear, Stearns/Gruss proposal with representatives of those firms. Prior to the consummation of the proposed Recapitalization, the Board will consider any proposal then available to the Company; such consideration and decision may take place either before or after the stockholder vote on the Recapitalization.

These statements preclude any inference that the shareholders have announced their preference for the recapitalization over a B/S/G deal if one is available. The shareholder vote may only be interpreted as a qualified approval of the recapitalization, that is approval contingent upon the board's pursuing in good faith the B/S/G proposal.

But, based upon the evidence currently available, I am persuaded that the board has not actually attempted to evaluate the extent of the risks presented by the contingencies inherent in the B/S/G proposal. Indeed it seems apparent that the board has no interest in this transaction, which would change control of the Company, sell-off some divisions and completely sever Clayton family involvement with the Company. That perceived lack of interest may stem from perfectly proper motives (i.e., the recapitalization is a better long-term deal for the shareholders) or from an improper motivation (i.e., maintenance of control of the Company and the offices that are involved). I surely cannot determine at this point which motivation, or another, predominates. But what does seem sufficiently apparent, even now, is that the board has not tried to see if the B/S/G alternative could be made a firm offer within a reasonable time.

In seeking shareholder approval of the recapitalization, the board, however, in essence said that it would do so. Its failure to do so is a species of inaccuracy on a material aspect of the matter that flaws the vote quite as much as the misrepresentation of a material fact would. Indeed, in the circumstances, I regard the statement

that the Company was, as of June 2, "continuing to discuss the Bear, Stearns/Gruss proposal with members of those firms" as at least misleading when the limited contacts and restricted nature of those contacts is known.

What concerns me at this stage, is not the motivation of the board in ultimately rejecting the B/S/G proposal, nor am I concerned at this juncture with the motivation of management in failing to negotiate substantively with the Bear, Stearns group. Rather what does concern me is whether the shareholders would have approved the recapitalization if they had been told, in essence, "we received the B/S/G proposal for $54. We think it is not the best available option, even if not subject to conditions. Therefore we won't bother to explore the nature of those conditions and the risks that they represent. If you approve the recapitalization we will promptly consummate it."

If on the basis of a disclosure that, in essence, took that position, the shareholders nevertheless approved the recapitalization they would have done so on what I now perceive as the correct understanding of the board's real attitude towards B/S/G. But the board made it appear at the time it published the proxy supplement that it was open-minded and that it was currently exploring and would continue to explore the option that the B/S/G proposal represented. Therefore, in voting to approve the recapitalization, stockholders may well have placed their trust in the directors in the hope of seeing a $54 cash offer emerge and not with the view to rejecting that possibility in favor of the recapitalization.

In these circumstances I conclude that plaintiffs have demonstrated a reasonable probability that the proxy supplement circulated on June 2 will be shown to be materially misleading in a way that would have been relevant to a reasonable shareholder voting to approve or disapprove the recapitalization.

## IV.

■ In *Smith v. Van Gorkom*, Del. Supr., 488 A.2d at 892 our Supreme Court pointed out that even "an otherwise candid proxy statement may be so untimely as to defeat its purpose of meeting the needs of a fully informed electorate." That principle has application in this case.

■ The steps taken initially by the Company's management and later ratified by the board, to notify the shareholders of the material development and to extend the voting time were reasonable steps given the decision to preserve the June 3 meeting date. In my view they were inadequate however. Indeed I cannot imagine how, given the need to pre-clear proxy materials with the SEC, matters could have been arranged so as to preserve that meeting date once a development that was so material occurred at such a late date. I note parenthetically that there is no basis to find in the record that the last minute nature of the B/S/G proposal was anything other than a bona fide expression of interest. That is, there is no basis to think it was merely a tactic designed to disrupt the existing schedule.

The proxy supplement was sent by mailgram on Monday and presumably delivered to each record shareholder that day. The meeting was the following day but the polls were kept open until 5:00 p.m. Thursday. Few shareholders availed themselves of the option to use the mailgram procedure set-up by management. Several inferences, at least, are possible. Either shareholders really didn't consider the B/S/G development very significant given its stated tentative nature, or shareholders thought it was significant but wanted management to have leverage in the negotiations that would be occurring and thus elected to continue to authorize the recapitalization. Alternatively, it is possible that few beneficial owners received the information in time to direct their broker or other registered owner to change their proxy vote.

It is impossible to determine which of these alternative explanations, or another, is true. However, I note that defendants cite no case where three days notice has been held adequate. *See Martin Marietta Corp. v. Bendix Corp.,* Del.Ch., C.A. 6942, Brown, C. (Sept. 19, 1982) (11 days and 9 days held adequate); *Electronic Specialty Co. v. International Controls Corp.,* 2d Cir., 409 F.2d 937 (1969) (8 days); *Nicholson File Co. v. H.K. Porter,* D.R.I., 341 F.Supp. 508 (1972) (7 days).

While I place on plaintiff the burden to establish a reasonable probability of success, I conclude that in these circumstances the extraordinarily short time afforded to shareholders to receive, consider and act upon new information very material to this important transaction itself establishes a likelihood of ultimate success on this issue.

### V.

Finally, I turn to plaintiffs' contention that the April 22 proxy solicitation misstates the appraisal law in Delaware. These materials provide that "[o]nly a holder of record of Common Stock on the Record Date is entitled to seek appraisal of the fair value of the Common Stock registered in such holder's name." Plaintiffs allege that this is a false recitation of the law, while defendants, of course, disagree.

Appraisal rights are extraordinarily important in this transaction. The capital gains treatment which is a central feature of the recapitalization will be available only if fewer than approximately 1.2 million shares validly seek appraisal. Accordingly, the recapitalization has been made contingent upon fewer than one million shares validly seeking appraisal.

Recognizing the importance of this point not only for this transaction but for Delaware corporate law generally, I conclude that the issues raised by the parties are simply too significant to be dealt with in the time frame provided by this motion. Having decided for the foregoing reasons that a preliminary injunction should issue, I decline to address the appraisal issue at this time.

### VI.

I have above touched upon the balancing of harms to the shareholders (represented by plaintiffs) that may result from denying the application against the possible harm that may result to shareholders (represented by defendants) from granting the remedy.

In reaching the determination that the predicate for issuance of a preliminary injunction has been satisfied in this case, I am not substituting my own view for that of the board on the question whether the recapitalization action is a desirable transaction. I have no view on that subject. Nor do I base this result on a view that Bear, Stearns has a right, as a shareholder or otherwise, to delay the recapitalization in order to put together, if it can, its own transaction. It has no such right.

As indicated above I do rest this decision upon statements contained in the supplemental proxy statement that are likely to be found on final hearing to be misleading and material to shareholders voting on the recapitalization and upon the fact that the meaning and effect of the shareholders' vote has been further clouded by the extremely short period that shareholders had to receive, consider and act upon significant new information. In these circumstances respect for the shareholders' right to determine the course of this company's future compels granting not denying the application in my view.

For the foregoing reasons the pending applications shall be granted. The parties will be heard this morning at 11:00 a.m. concerning the form of appropriate implementing order and an appropriate bond. Plaintiffs shall at that time, after conferring with defendants, present a proposed form of order.